JANE DOE (C.T.K.) an individual,

Plaintiff,

v.

CHOICE HOTELS INTERNATIONAL, INC., CHOICE HOTELS INTERNATIONAL SERVICES CORP., and APP PRO OF APPLETON, INC. Defendants.

CIVIL ACTION NO: 2:25-cv-01274-WCG

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Jane Doe (C.T.K.), Plaintiff in the above-styled and numbered cause, files this Second Amended Complaint against CHOICE HOTELS INTERNATIONAL, INC.; CHOICE HOTELS INTERNATIONAL SERVICE CORP; and APP PRO OF APPLETON, INC. as Defendants, and would respectfully show the Court and jury as follows:

## SUMMARY

1. Jane Doe (C.T.K.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion.[1] Traffickers use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

3.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

4.     Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.     In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.     Jane Doe (C.T.K.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (C.T.K.), with minimal risk of detection or interruption. Jane Doe (C.T.K.) further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

7.     Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe (C.T.K.) experienced as the result of continuous sexual exploitation. Defendants failed to do so. Instead, Defendants chose to benefit from facilitating sex trafficking. Accordingly, Jane Doe (C.T.K.) files this lawsuit.

**PARTIES**

2

8. Plaintiff, Jane Doe (C.T.K.) is a resident of Wisconsin. She may be contacted through her lead counsel, whose information is contained below.

9. Jane Doe (C.T.K.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

10. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (C.T.K.)

11. Choice Hotels International, Inc. is a for-profit Delaware corporation with its principal place of business in North Bethesda, Maryland. Choice Hotels International, Inc. has been served and made an appearance.

12. Choice Hotels International Service Corp. is a Delaware corporation with its principal place of business in North Bethesda, Maryland. Choice Hotels International, Inc. has been served and made an appearance.

13. All references to Defendants Choice Hotels International, Inc. and Choice Hotels International Service Corp. include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Choice Hotels International, Inc. now or at any time relevant to the claims herein.

14. Defendants Choice Hotels International, Inc. and Choice Hotels International Service Corp, will collectively be referred to as "Choice Hotels," or "Franchisor Defendants." Upon information and belief, they owned, operated, controlled, and/or managed the following Franchisee locations:

a.  App Pro of Appleton, Inc. d/b/a Comfort Suites located at 3809 W. Wisconsin Avenue, Appleton, Wisconsin 54915.

15.     App Pro of Appleton, Inc. is a for-profit Delaware corporation with its principal place of business in Fond du Lac, Wisconsin. App Pro of Appleton, Inc. has been served and made an appearance.  At all relevant times, App Pro of Appleton, Inc. owned, operated, and controlled the Comfort Suites located at 3809 W. Wisconsin Avenue, Appleton, Wisconsin 54915 (hereafter referred to as the "subject Comfort Suites"). App Pro of Appleton, Inc. will be referred to as a "Franchisee Defendant."

16.     All references to App Pro of Appleton, Inc. include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of App Pro of Appleton, Inc. now or at any time relevant to the claims herein.

## JURISDICTION AND VENUE

17.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

19.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

4

**I. Jane Doe (C.T.K.) is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

20. Traffickers used fraud, coercion, and ultimately force to cause Jane Doe (C.T.K.) to engage in commercial sex for their financial benefit.

21. One of Jane Doe (C.T.K.)'s traffickers initially pretended to be her boyfriend. He preyed on her obvious vulnerabilities and used false promises that he wanted a romantic relationship and that he would take care of Jane Doe (C.T.K.) to groom her and make her dependent on him. However, it soon became apparent that these promises were fraudulent. Jane Doe (C.T.K.) learned that he and associates were trafficking other women and, before long, he and his associates instructed her to engage in commercial sex to earn them money.

22. Jane Doe (C.T.K.)'s traffickers would post her online, communicate with customers, set the rates, and dictate when and where Jane Doe (C.T.K.) had to engage in commercial sex.

23. Jane Doe (C.T.K.)'s traffickers kept all money earned from commercial sex. They used their control over all money to further cement her dependence on them and establish and maintain control over her. While trafficked, Jane Doe (C.T.K.) did not have a residence apart from her traffickers and did not have a vehicle. Because she was not allowed to keep any of the money earned, she depended on her traffickers for access to basic necessities, which they used to ensure she complied with their demands. Once Jane Doe (C.T.K.) was dependent on her traffickers, they became increasingly controlling and abusive.

24. These traffickers also used drug dependence to coerce Jane Doe (C.T.K.). They provide her with heroin to fuel a drug dependence but then threatened to cut her access to drugs and to cut off her financial support if she did not comply. At times, they did withhold her access to ensure that she complied with their demands.

5

25. Jane Doe (C.T.K.)'s traffickers used both verbal and physical abuse to ensure her compliance with their demands and in response to any sign of resistance. They degraded and demeaned her, threatened her, and beat her when she failed to comply with their demands.

26. Jane Doe (C.T.K.)'s traffickers were arrested on trafficking-related charges. Jane Doe (C.T.K.) assisted in their prosecution.

27. During her trafficking period, specifically from July 1, 2014 through March 31, 2015, Jane Doe (C.T.K.) was trafficked at the subject Comfort Suites.

28. Jane Doe (C.T.K.)'s trafficking repeatedly occurred in rooms of this subject Comfort Suites location and was facilitated by Choice Hotels and Franchisee Defendants.

**II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

29. While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Franchisor Defendants and Franchisee Defendants knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (C.T.K.), was pervasive and apparent at the locations at issue.

30. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*
[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

6

Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

31. Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.[6]

32. This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

33. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[7] include:

---

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[7] *See id.*

a. individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
b. a group of girls who appears to be traveling with an older female or male;
c. a group with similar tattoos, which can indicate "branding" by a trafficker;
d. individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
e. individuals who seem disoriented;
f. individuals showing signs of physical abuse;
g. individuals showing signs of restrain or confinement;
h. individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
i. individuals with signs of untreated illness or injuries;
j. individuals who appear to lack freedom of movement;
k. individuals who are being constantly monitored and/or escorted around the hotel;
l. individuals who avoid eye contact;
m. individuals who avoid interactions with others;
n. individuals who are not in possessions of their own identification;
o. individuals who have few or no personal possessions;
p. individuals who dress provocatively;
q. a high volume of men who are not registered guests entering and exiting a room; and
r. individuals who wait in common areas while other men frequent the room.

34. Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[8] include:

a. patrons appeared distressed at check-in;
b. the same person reserving multiple rooms;
c. rooms paid for with cash or prepaid cards;
d. rooms are paid for one day at a time;
e. requests for isolated rooms or rooms close to an exit;
f. use of hotel computers for adult oriented or sexually explicit websites;
g. patrons not forthcoming about identifying information when registering;
h. individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
i. individuals lack identification;
j. car in the parking lot is parked so license plate is not visible;
k. individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
l. individual appears to be giving scripted responses.

---

[8] *See id.*

35.     Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff9 include:

   a.   constant use of the "Do Not Disturb" sign;
   b.   requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
   c.   refusal of cleaning services for multiple days;
   d.   excessive amounts of cash in a room;
   e.   presence of multiple computers, cell phones, pagers, or other technology;
   f.   the same person reserving multiple rooms;
   g.   individuals leaving the room infrequently, not at all, or at unusual hours;
   h.   individuals loitering in hallways or appearing to monitor a room;
   i.   excessive alcohol in a room;
   j.   illegal drugs in a room;
   k.   evidence of pornography;
   l.   excessive number of people staying in a room;
   m.   guests with few or no personal possessions in room;
   n.   provocative clothing and shoes;
   o.   constant flow of men into a room at all hours; and
   p.   excessive amounts of sex paraphernalia in rooms.

36.     The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [10]

37.     Before C.T.K.'s trafficking period, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking

---

[9] *See id.*
[10] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

and instructed and trained their staff to treat them as signs of sex trafficking when observed in its hotel(s).

38.     It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

39.     There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[11] As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[12] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[13]

40.     State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[14]

---

[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[12] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[13] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

[14] United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[15]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[16]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[17]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[18]

41. When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

42. Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of C.T.K.'s

---

[15] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[16] https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[17] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[18] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention Courts*, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

trafficking, each Defendant was on notice and recognized that signs of commercial sex in a hotel are and should be treated as signs of sex trafficking.

43. Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

44. The most effective weapon against sexual exploitation and human trafficking is education and training.[19] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[20]

45. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[21] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

---

[19] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[20] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[21] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

46. Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

47. Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like Jane Doe (C.T.K.)

48. Unfortunately for Jane Doe (C.T.K.), the promises made by the Franchisor Defendants and Franchisee Defendant have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (C.T.K.).

### III. Sex Trafficking Has Long Been Prevalent at Choice Hotels Branded Properties, and Defendants Have Known About It.

49. Defendants' actual knowledge is *not* limited to general awareness of the problem of sex trafficking in the hotel industry. Choice Hotels has also known, since well before Jane Doe (C.T.K.) was trafficked at the subject Comfort Suites, that sex trafficking is endemic in its branded hotels specifically.

50. Upon information and belief, Choice Hotels monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the subject Comfort Suites.

51.     On information and belief, Choice monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the subject Comfort Suites. Information that has become public through news stories establishes the entrenched and pervasive nature of the Choice's role in providing a venue where sex trafficking has continued unabated for years. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice hotels and Choice's notice of the same:

- In 2004, A Los Angeles County woman faces charges of running a brothel in a budget motel across the street from Disneyland after three immigrants told police they were smuggled into the country and forced into prostitution. Guest at the Econo Lodge, where the makeshift brothel was operated, can see the Disneyland Hotel and a giant set of Mickey Mouse ears silhouetted on a roller coaster at California Adventure, Disneyland's sister attraction.[22]

- In 2012, A nationwide sex trafficking ring run by a violent pimp and his associates used Backpage.com to solicit customers for prostitutes as young as age 17, advertising the women as "smokin' hot babes," according to a federal indictment recently unsealed in Iowa. The two are charged in Iowa because Des Moines was a site where the ring did business on at least four occasions, sometimes holing up in an Econo Lodge near Interstate 35, the indictment says.[23]

- In 2013, A man arrested for human trafficking in Dothan appears to be part of a human trafficking circuit. Police say Alonso Santiagito held a Mississippi teen against her will, beat her, forced her to do drugs, and sold her for sex. He was holding the girl and other victims at the Quality Inn on Ross Clark Cir.[24]

- An Orlando man faces several felony charges after authorities say he kept an underage girl as a prostitute against her will and beat her. The investigation into Tyquarius Jevonte Lebby, 24, began Dec. 8 after the Metropolitan Bureau of Investigation received a tip that an underage girl was being held against her will at an Orange Blossom Trail motel, according to court documents. Authorities found explicit pictures of the girl on the internet. Agents posed undercover as

---

[22] Claire Luna and Mai Tran, *Arrest in Sex Slave Case*, Los Angeles Times (February 13, 2004), https://www.latimes.com/archives/la-xpm-2004-feb-13-me-sexslave13-story.html
[23] Ryan J. Foley, *Feds: Sex trafficking ring used Backpage.com ads*, Associated Press (May 24, 2012), https://apnews.com/article/archive-de22067580494953bc14f6e9cfcca4aa
[24] *Dothan man arrested for human trafficking a teenager*, WTVM news 9 (August 13, 2013), https://www.wtvm.com/story/23122332/dothan-man/

clients and went to a room at the Rodeway Inn on the 6100 block of South Orange Blossom Trail.[25]

- In 2013, Two Columbia residents arrested in connection with a nationwide child sex trafficking bust were denied bond Monday in federal court. The 16-year-old, whose picture appeared in an online ad on backpage.com, was allegedly used for prostitution on three days in hotels in Columbia and Hilton Head. The FBI has hotel receipts where Gibson paid cash for the room at Quality Inn at the time of the undercover operation, as well as a copy of his driver's license where he reserved the room.[26]

- In 2013, A runaway Mississippi teen has found herself caught in the middle of a South Alabama sex slavery ring. The girl, whom police say is over 15, was held against her will at the Quality Inn in Dothan.[27]

- In 2013, Milwaukee police are searching for a 34-year-old man believed to have kidnapped a homeless woman and forced her into prostitution. Reno took photos of her and posted them on an online site known to advertise prostitutes and forced her into prostitution at the Rodeway Inn in Milwaukee.[28]

- In 2013, Jerel Jackson, 28, allegedly operated a prostitution venture between May 2012 and July 2013 primarily out of motels in Philadelphia. In April 2013, Jackson drove her and three others to Dover, Del., where they worked out of a room at the Sleep Inn and Suites on N. Dupont Highway until their operation was shut down by local police, according to the affidavit.[29]

- In 2014, Charlotte-Mecklenburg Police have arrested three people on human trafficking charges. Officers were called out to the Quality Inn on Griffith Street a couple of days ago to investigate a complaint.[30]

- In 2014, A Houston County jury found a Tennessee man guilty on Thursday afternoon of human trafficking and giving drugs to a 17-year-old girl. Police were made aware of the case when the victim left the Quality Inn, where she

[25] Michael Williams, *Authorities: Man trafficked, beat underage girl*, Orlando Sentinel, https://digitaledition.orlandosentinel.com/tribune/article_popover.aspx?guid=15cb9583-a04b-4eba-a5e7-5e38eefb25f7

[26] *Two accused of sex trafficking children denied bond*, WIS News 10 (August 5, 2013), https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/

[27] *Shock after man charged with human trafficking of girl in Dothan*, WSFA News 12 (August 13, 2013), https://www.wsfa.com/story/23118431/shock-after-man-charged-with-human-trafficking-of-girl-in-dothan/

[28] Ashley Luthern, *Milwaukee police search for man in kidnapping*, prostituting of woman, Milwaukee Journal Sentinel (August 2, 2013), https://archive.jsonline.com/news/crime/milwaukee-police-search-for-man-in-kidnapping-prostituting-of-woman-b9967520z1-218117721.html/

[29] Sam Wood, *Philly man faces charges of sex-trafficking by force*, The Inquirer (November 14, 2013), https://www.inquirer.com/philly/hp/news_update/Philly_man_faces_charges_of_sex-trafficking_by_force.html?outputType=amp

[30] *3 arrested on human trafficking charges in Charlotte*, WCNC News (May 30, 2014), https://www.wcnc.com/article/news/crime/3-arrested-on-human-trafficking-charges-in-charlotte/275-292839989

said she was being held, and walked almost 8 miles to the Guest House Inn, where she was taken in by a patron there.[31]

- In 2014, Two people arrested and charged with the human trafficking of 16 and 17-year-old girls at North Monroe Street hotels last week caught the eyes of the community and human trafficking experts, who say the case may be part of a larger enterprise in Tallahassee. In addition to the teens, two other violent confrontations at the Econo Lodge on North Monroe Street involved women working as prostitutes with Backpage ads.[32]

- In 2015, Three people are in custody following the discovery of drug and prostitution operations in Pooler, Georgia. Undercover Chatham-Savannah Counter Narcotics Team (CNT) agents conducted a search of two hotel rooms at the Econo Lodge hotel located at 500 East Highway 80 in Pooler, Georgia. The search resulted in the seizure of controlled substances, items commonly associated with drug use and distribution, items commonly associated with prostitution and various weapons.[33]

52.     These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice branded hotels. Moreover, on information and belief, Chois is aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

53.     Reviews of Choice Hotels branded properties, which upon information and belief Choice Hotels monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Choice Hotels knowledge of the same. For example:

- A TripAdvisor review from January 26, 2006, stated, "Hookers in the parking lot approaching members of our group.  When I complained, especially about the hookers, I was told there wasn't much they could do and they would 'pass on the complaints to the management.'"[34]

---

[31]*Man Guilty in Human Trafficking Case*, End Slavery Tennessee, (May 15, 2014), https://www.endslaverytn.org/news/man-guilty-in-human-trafficking-case-newsarticle
[32] Sean Rossman, *Arrests for sex trafficking 'tip of the iceberg' in Tallahassee*, Tallahassee Democrat (June 2, 2014), https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/
[33] *Multiple arrests in Pooler for drugs and prostitution*, WJCL News 22 (September 25, 2015), https://www.wjcl.com/article/multiple-arrests-in-pooler-for-drugs-and-prostitution/935100#
[34]https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html

- A TripAdvisor review from September 18, 2012, stated, "Worst hotel ever…The smell of weed was horrible. Smell came right in our room from all the other rooms. Hookers up and down the hallways…never again!"[35]

- A TripAdvisor review from January 21, 2012, stated, "During my stay here every time I would go outside I was approached by someone wanting to bum a cigarette or wanting to sell me or buy drugs. The staff here are extremely rude to say the least. When I questioned why all the drug dealers and prostitutes, I was told by a member of the hotel staff because business is slow…If you are a normal everyday person, and not a drug addict or a John looking to get laid you don't want to come here!!!"[36]

- A Yelp review from October 2, 2012, stated, "Great hotel, if you enjoy being propositioned by prostitutes. Skid row's finest. A real DUMP."[37]

- A TripAdvisor review from October 22, 2013, stated, "Don't go unless you are looking for 1 hour hotel! Cock roaches and used condoms were found in our room. Hotel staff is obviously used to these complaints. They simply asked, 'how many of them did you exactly find?' there were few drug addicts in the hotel!!!"[38]

- A TripAdvisor review from August 20, 2013, stated, "Two types of Hookers were offered by a pimp standing at the stairway (regular and tranny, whatever that means). Also, there is a lot of weed being smoked in the area, so no need to buy any from the dealer who stood in the parking lot all night, just inhale in your room and you'll be high enough. We did not feel safe since the pimp that hung around carried a gun visibly and told us, 'not to worry about anything, he had the area covered.'"[39]

- A TripAdvisor review from October 25, 2012, stated, "This hotel is awful. Between hookers running around, car alarms going off, people fighting and fussing, and the train that runs through here every night. I PROMISE YOU WON'T GET ANY SLEEP. It's pretty old and nasty. I have no idea how their in business. I'm assuming it's just for local hookers and drugs. Stay far away from here!!!"[40] *The Guest Relations Manager replied, "Please know that we have security on site to ensure the safety of our guests. We do not promote illegal activities at our hotel. If you or any other travelers are suspicious of*

---

[35] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html

[36] https://www.tripadvisor.ca/Hotel_Review-g34141-d84259-Reviews-Rodeway_Inn_Clearwater_Largo-Clearwater_Florida.html

[37] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota

[38] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html

[39] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html

[40] https://www.tripadvisor.com/Hotel_Review-g54229-d275440-Reviews-Suburban_Extended_Stay_Hotel-Florence_South_Carolina.html

*guest behavior, we ask that you contact a member of our team immediately so that hotel security can investigate the situation."*

- A TripAdvisor review from January 5, 2013, stated, "Upon arriving back [at the hotel] our second night we were greeted by a woman of "dubious morals" (hooker" sitting outside waiting for her "date" to arrive, we assumed."[41]

- A TripAdvisor review from April 24, 2013, stated, "This was the most disgusting hotel I have ever had the misfortune of checking into. I had come to Orlando to meet with my sister who was flying in from the UK…Checked in, and 30 minutes later checked out. This hotel had cockroaches, the room we were given was filthy, a visiting prostitute went to the room next door whilst we stood and watched."[42]

- An Expedia review form November 9, 2013, stated, "I would not recommend this hotel to my worst enemy. The room next to me was being used to turn "tricks." Drunk or drugged out guests were yelling during the night. They were also running up and down the corridor beating on the doors at 4:00 in the morning. Did not feel one bit safe at this hotel. Actually checked out early and stayed somewhere else. Never stay here."[43]

- An Expedia review from February 11, 2014, stated, "The price is nice for what we got the room for ($42/night) but honestly it wasn't worth it. I would of rather paid little more for a nicer place. First night we heard some prostitute arguing with some cheapskate guy and kicked him out her room and was crying. We were hardly at the room tho, which helped. It's a pretty sketchy hotel in my opinion."[44]

- An Expedia review from July 17, 2016, stated, "The only nice part was the pool, which was not clean…The hotel seemed to be a front of a drug cartel. The staff smiled at you but did not care about the quality of your stay. Someone tried to break into our room at 1 am. Scared the out of me and my family. Will never stay again…instead I will choose to sleep on the side of the road. DO NOT STAY HERE!"[45]

---

[41]https://www.tripadvisor.co/Hotel_Review-g34657-d231960-Reviews-Suburban_Extended_Stay_Hotel_Stuart-Stuart_Florida.html

[42] https://www.tripadvisor.ca/Hotel_Review-g34515-d85472-Reviews-Quality_Inn_Orlando_Near_Universal_Blvd-Orlando_Florida.html

[43] https://www.expedia.com/Florence-Hotels-Suburban-Extended-Stay-Hotel.h911306.Hotel-Reviews

[44] https://www.expedia.com/Tampa-And-Vicinity-Hotels-Suburban-Studios-Airport.h885992.Hotel-Reviews

[45] https://www.expedia.com/Augusta-Hotels-Suburban-Extended-Stay-Hotel.h168338.Hotel-Reviews

- A Google review from 2016, stated, "The place sucks.  We had spiders under the sheets when pulled them off the bed.  Would not recommend the place to anyone.  Plus all the prostitution outside makes it even worse."[46]

- A Google review from 2016, stated, "AWFUL!!! Was extremely filthy.  Smelled of mold and body odor.  Early evening before dark when we checked in it seemed pretty quiet.  As it got dark and later into night, the whole place seemed to fill up with prostitutes.  Very loud."[47]

- A TripAdvisor review from September 15, 2016, stated, "I've stayed in some BAD places before, but this hotel wins the prize for most nasty…Every night was a drunken Las Vegas type party outside our room, and the prostitutes basically ran the show…There is basically no maid service.  You have to ask them to clean your room…there are people fighting drunk outside every night, prostitutes running around in their underwear, you could smell marijuana coming out of every room, and drug dealers were running around asking folks what they wanted."[48]

- A Yelp review from April 2, 2016, stated, "By far this has been the worst hotel experience I've ever encountered.  Between the extremely loud drunks all night, the mass amounts of prostitution (I was asked by 3 if I wanted their services), the drug dealers everywhere (I was asked by 2 if I wanted to buy drugs).  All of these people were staying at your hotel.  I was originally going to stay for 16 days but do to all the above I was forced to change hotels.  This was supposed to be my vacation while visiting my kids before I go back out on deployment.

---

[46]https://www.google.com/travel/hotels/Suburban%206902%20W%20Hillsborough%20Ave,%20Tampa,%20FL%2033634%20google/entity/CgsIx-qG0bLw1cqSARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4892707,4893075,4902277,4905351,4905599,4926165,4926489,4931360,4935494,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+6902+W+Hillsborough+Ave,+Tampa,+FL+33634+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxAEGBISBwjnDxAEGBMgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4YzJjMjA2N2Q0M2FlZTE6MHg5Mjk1NTc4MzJhMjFiNTQ3&rp=EMfqhtGy8NXKkgEQx-qG0bLw1cqSATgCQABIAcABAg&ictx=1

[47]https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20Stuart,%20FL%2034994/entity/CgsIv4-a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4906050,4920622,4926165,4926489,4930751,4930753,4931265,4934307,4936396,4937954,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1900+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUweDg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlZjFhNDDjMjY4N2Jm&rp=EL-PmuHHtLyXnwEQv4-a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO--P8AhXQkWoFHejJC8MQ4gl6BAh5EAU

[48]https://www.tripadvisor.com/Hotel_Review-g54229-d275440-Reviews-Suburban_Extended_Stay_Hotel-Florence_South_Carolina.html

And the way they corrected this wrong doing is by emailing me a 'I'm sorry letter.' This place need to be closed down."[49]

- A Google review from 2017, stated, "Hotel filled with hookers, drug dealers, drunks and awful rooms."[50]

- A Google review from 2018, stated, "The worst, I left room after I found the 5th cock roach. Hotel full of semi-permanent residents, prostitutes, and drug addicts…Can't believe this is a name brand hotel, do not stay here if you're driving by hit the gas and keep on going."[51]

- A Google review from 2018, stated, "Well what can I say about here…if your looking for drugs and prostitution delivered to your door, then look no further…So if you are looking for an overpriced pay by the night trap house, the Suburban is for you. Good luck!"[52]

- A Google review from 2018, stated, "This place is absolutely disgusting! They have prostitutes and drug dealers renting rooms and running in and out all night

[49] https://www.yelp.com/biz/suburban-extended-stay-hotel-florence

[50]https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201914%20W%20Lucas%20St,%20Florence,%20SC%2029501%20google/entity/CgoIs5OZ1oTbiY1aEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930752,4931360,4934343,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1914+W+Lucas+St,+Florence,+SC+29501+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAESBwjnDxACGAIgADAeQMoCSgcI5w8QARgeCjQIDBIwEi6yASsSKQonCiUweDg4NTU2NjQ0YzU1MGE1OWY6MHg1YTFhMjZkODRhYzY0OWIz&rp=ELOTmdaE24mNWhCzk5nWhNuJjVo4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwil7YSNwfD8AhXFyLsIHZ08ClMQ4gl6BAhmEAU

[51]https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20Stuart,%20FL%2034994/entity/CgsIv4-a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4906050,4920622,4926165,4926489,4930751,4930753,4931265,4934307,4936396,4937954,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1900+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUweDg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlFhNDdjMjY4N2N2Jm&rp=EL-PmuHHtLyXnwEQv4-a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO--P8AhXQkWoFHejJC8MQ4gl6BAh5EAU

[52]https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20Stuart,%20FL%2034994/entity/CgsIv4-a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4906050,4920622,4926165,4926489,4930751,4930753,4931265,4934307,4936396,4937954,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1900+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUweDg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlFhNDdjMjY4N2N2Jm&rp=EL-PmuHHtLyXnwEQv4-a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO--P8AhXQkWoFHejJC8MQ4gl6BAh5EAU

long and they are very well aware of it, but do nothing about it except continue to rent them rooms day after day."[53]

- A Google review form 2018, stated, "Awful experience…Checked out half hour after we checked in and still got charged for the night. Drug dealing and sex trading going on out in the open."[54]

54. These reviews are limited representative examples. There are many similar online reviews for Choice branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from in and before Jane Doe (C.T.K.)'s trafficking period that are not currently available on the internet, but which Choice know about due to monitoring reviews for its branded hotels.

55. Choice's public statements regarding trafficking confirm that it was, at all relevant times, aware of the problem in the hospitality industry and in its own hotels. For example:

- Choice's Board of Directors has been discussing human trafficking issues since at least 2008 when they adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.

- In 2009, Choice faced public outcry including a Change.org petition as a result of the child sex trafficking occurring in its hotels. In 2010, the petition was updated to state "Choice Hotels has agreed to take important and proactive steps to protect children from child prostitution and sexual exploitation."[55]

---

[53]https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201914%20W%20Lucas%20St,%20Florence,%20SC%2029501%20google/entity/CgoIs5OZ1oTbiY1aEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4930751,4930752,4931360,4934343,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1914+W+Lucas+St,+Florence,+SC+29501+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAESBwjnDxACGAIgADAeQMoCSgcI5w8QARgeCjQIDBIwEi6yASsSKQonCiUweDg4NTU2NjQ0YzU1MGE1OWY6MHg1YTFhMjZkODRhYzY0OWIz&rp=ELOTmdaE24mNWhCzk5nWhNuJjVo4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwil7YSNwfD8AhXFyLsIHZ08ClMQ4gl6BAhmEAU
[54]https://www.google.com/travel/hotels/Suburban%20Extended%20Stay%201900%20SE%20Federal%20Hwy,%20Stuart,%20FL%2034994/entity/CgsIv4-a4ce0vJefARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4906050,4920622,4926165,4926489,4930751,4930753,4931265,4934307,4936396,4937954,47061553&hl=en-US&gl=us&ssta=1&q=Suburban+Extended+Stay+1900+SE+Federal+Hwy,+Stuart,+FL+34994&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBMSBwjnDxACGBQgADAeQMoCSgcI5w8QARgZCjQIQIDBIwEi6yASsSKQonCiUweDg4ZGVkZDBjNGM5ZGJhYTc6MHg5ZjJlZjFhNDDdjMjY4N2Jm&rp=EL-PmuHHtLyXnwEQv4-a4ce0vJefATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjLl_OO--P8AhXQkWoFHejJC8MQ4gl6BAh5EAU
[55] https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels

- Choice has publicly claimed that it started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010. On information and belief, prior to Jane Doe (C.T.K.)'s trafficking period, Choice had reviewed and was familiar with Polaris publications regarding trafficking in the hospitality industry, which include detailed recommendations for how hotels can avoid facilitating trafficking.

- On information and belief, in November 2010, Choice publicly claimed to be partnering with ECPAT-USA to develop a training module to educate hotel management and staff in the prevention of sex trafficking. Unfortunately, Choice delayed for years before implementing anti-trafficking training at its hotels, at the expense of victims like Jane Doe (C.T.K.)

56. Despite its awareness of the problem of sex trafficking, Choice continued to operate in ways that it knew or should have known would facilitate ongoing sex trafficking at its hotels and, therefore, continued to financially benefit from the use of its hotels for the trafficking of victims.

57. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe (C.T.K.) was trafficked at the subject Comfort Suites, Choice knew or should have known:

    a. The use of Choice branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b. Commercial sex work occurring at Choice branded properties involved trafficking and compelled prostitution;

    c. Choice franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Choice hotel properties;

    d. Their efforts, if any, to stop facilitating sex trafficking in Choice branded properties were not effective; and

    e. Choice was, by acts and omissions, facilitating sex trafficking at Choice branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

58.     Despite the continually mounting evidence that sex trafficking at Choice branded properties was ongoing and growing, Choice did not change course. Choice chose to continue earning revenue by allowing their hotels to serve as venues for trafficking.

**IV.     Sex Trafficking Was Prevalent and Obvious at Comfort Suites**

59.     Choice Hotels and App Pro of Appleton, Inc. were also specifically aware that sex trafficking was prevalent at the subject Comfort Suites.

60.     Choice Hotels and App Pro of Appleton, Inc. knew that the Comfort Suites was in a high-crime area with a known history of reports of sex trafficking. At and around the time of Jane Doe (C.T.K.)'s trafficking, there was a known problem with prostitution and sex trafficking in area hotels.

61.     Police involvement at the Comfort Suites, which upon information and belief was monitored by Choice Hotels and App Pro of Appleton, Inc., establishes the nature of the Comfort Suites' role as a venue for sex trafficking. Outagamie County Sheriff's Office deputies regularly were involved at the subject Comfort Suites from July 1, 2014 to March 31, 2015 for calls regarding sex offenses, illegal drugs, and harassment – all signs of illegal sex trafficking.

62.     Jane Doe (C.T.K.) was aware that her traffickers used the subject Comfort Suites to traffic other victims.

63.     Jane Doe (C.T.K.) observed that her traffickers communicated with others in the Appleton area about which hotels were most favorable for their illegal activities and which had security practices that increased the risk of detection or traceability. The reputation of the subject Comfort Suites was that it could be used as a venue for illegal activity and that staff would turn a blind eye to signs of criminal activity while allowing the hotel to be used to further that activity.

23

64. Jane Doe (C.T.K.)'s traffickers repeatedly chose to use the subject Comfort Suites because they developed an understanding that they could operate there without interference by the hotel staff.

65. Traffickers, including Jane Doe (C.T.K.)'s trafficker, repeatedly chose to use the subject Comfort Suites location for their sex trafficking activity. As such, Choice Hotels and Franchisee Defendants also knew or should have known about the pervasive sex trafficking at the Comfort Suites location based on obvious indicators of this activity.

66. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Comfort Suites location prior to Jane Doe (C.T.K.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

67. During the period that Jane Doe (C.T.K.) was trafficked at the subject Comfort Suites, there were obvious signs that her traffickers were engaged in sex trafficking:

    a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

    b. Other girls were trafficked at the same hotel at the same time as Jane Doe (C.T.K.);

    c. Jane Doe (C.T.K.) and her traffickers stayed multiple times between July 1, 2014 through March 31, 2015;

d. Jane Doe (C.T.K.) or another victim was often forced to go to the front desk to rent the room;

e. Her trafficker was often present with Jane Doe (C.T.K.) at check-in, monitoring her;

f. Jane Doe (C.T.K.) asked for clean sheets and towels multiple times a day;

g. Jane Doe (C.T.K.)'s trafficker would remain on site at the subject Comfort Suites, such as remaining in the pool area, even though he was not a registered guest at the hotel;

h. Jane Doe (C.T.K.) would often be dressed in provocative clothing while checking in or in common areas of the hotel;

i. Jane Doe (C.T.K.) was noticeably impaired by drugs while at the subject Comfort Suites;

j. Jane Doe (C.T.K.) was significantly underweight, anxious, and often in a daze while being trafficked;

k. There was heavy foot traffic in and out of Jane Doe (C.T.K.)'s room involving men who were not hotel guests;

l. Jane Doe (C.T.K.) had multiple johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time;

m. Jane Doe (C.T.K.)'s traffickers would be visible coming and going from the hotel room to collect the money earned from commercial sex;

n. The traffic to and from Jane Doe (C.T.K.)'s room would pass by the front desk and would be visible to other staff, such as housekeeping, performing ordinary duties at the hotel;

o. When housekeeping entered the room after they left, there would be visible sex paraphernalia and evidence of drug use;

p. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

68. Based upon information and belief, multiple employees at the subject Comfort Suites, including management-level employees, observed, or were made aware of these obvious signs of trafficking while performing normal operations at the hotel.

25

69. All knowledge from the staff at the Comfort Suites location is imputed to to App Pro of Appleton, Inc who provided "boots on the ground" at that hotel and employed the hotel staff. Thus, App Pro of Appleton, Inc knew about or was willfully blind to this widespread and ongoing trafficking at its hotel, including the trafficking of Jane Doe (C.T.K.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to Choice Hotels based on the existence of an agency relationship as described below.

70. Upon information and belief, App Pro of Appleton, Inc also had notice of the sex trafficking and other associated criminal activity at the subject Comfort Suites based on:

    a. surveillance of the property;

    b. internal investigations;

    c. customer complaints;

    d. monitoring of customer feedback;

    e. information received from law enforcement;

    f. and other sources of non-public information available to App Pro of Appleton, Inc.

71. App Pro of Appleton, Inc. also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (C.T.K.) at the subject Comfort Suites because that activity was accompanied by sufficient recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If App Pro of Appleton, Inc. had exercised reasonable prudence in operating the subject Comfort Suites, they would not have benefited from the illegal activities of Jane Doe (C.T.K.)'s traffickers at this hotel.

72. Upon information and belief, Choice Hotels knew or should have known about the widespread trafficking at the Comfort Suites location referenced herein, based on:

    a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to Choice Hotels;

b.  The Choice Defendants' regular monitoring of online reviews;

c.  Choice Hotels' collection and monitoring of customer surveys and complaints;

d.  Choice Hotels' requirement that franchisee submit regular and detailed reports to Choice Hotels about day-to-day hotel operations;

e.  Choice Hotels' collection and monitoring of data about guests at the subject Wyndham locations, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  Choice Hotels' supervision and control over day-to-day operations of the Comfort Suites location through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which App Pro of Appleton, Inc was obligated to allow Choice Hotels to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  Choice Hotels' regular inspections of the subject Wyndham locations;

h.  Information provided to Choice Hotels by law enforcement;

i.  Choice Hotels' access to surveillance and security systems; and

j.  Other sources of information that were available to Choice Hotels.

73.  On information and belief,  Choice Hotels was on notice of obvious "red flags" of numerous instances of sex trafficking occurring at the subject Comfort Suites based on their supervision and monitoring of the property. As a result, Choice knew or should have known that the subject Comfort Suites was facilitating sex trafficking.

74.  Choice Hotels had constructive knowledge of Jane Doe (C.T.K.) trafficking at the subject Comfort Suites because the activity there was accompanied by numerous and obvious, industry-recognized red flags of sex trafficking, which any hotel exercising ordinary diligence  in response to the known problem of sex trafficking throughout its operations would have detected and acted upon. Had Choice Hotels exercised ordinary prudence in the areas of hotel operations

27

they controlled or in which they directly participated, they would not have benefited from the illegal activities of Jane Doe (C.T.K.)'s traffickers at the subject Comfort Suites.

**V.     Defendants actively facilitated sex trafficking at the subject Comfort Suites property that resulted in the trafficking of Jane Doe (C.T.K.).**

75.     Choice Hotels and Franchisee Defendant had both actual and constructive knowledge of the trafficking of Jane Doe (C.T.K.) at the Comfort Suites property because the trafficking was the direct result of Choice Hotels and Franchisee Defendant facilitating her trafficking at the Comfort Suites property.

**a.  Franchisee Defendant facilitated the trafficking of Jane Doe (C.T.K.).**

76.     Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the Comfort Suites when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at these Choice Hotels branded locations including the subject location.

77.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Comfort Suites location, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims such as Jane Doe (C.TK.).

78.     Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (C.T.K.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.T.K.)'s sexual exploitation.

79. Franchisee Defendant also facilitated widespread trafficking at their subject Comfort Suites location, including the trafficking of Jane Doe (C.T.K.), in ways including:

a. continuing to provide rooms, services, and assistance despite clear red flags of trafficking;

b. allowing traffickers to operate in ways that minimized the risk of future traceability;

c. allowing a high volume of sex buyers, who were not registered hotel guests, to freely access the hotel without requiring identification or taking any other steps to log or track these unregistered visitors;

d. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

e. using inappropriate and inadequate policies and protocols for detecting, documenting, and escalating signs of sex trafficking;

f. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff; and

h. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

**b. The Choice Hotels Defendants facilitated the trafficking of Jane Doe (C.T.K.).**

80. Upon information and belief, the Choice Hotels Defendants participated directly in aspects of the operation of the subject Comfort Suites location that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (C.T.K.), as follows:

a. The Choice Hotels Defendants have publicly assumed responsibility and control over the human trafficking response of all Choice Hotels properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

29

b. The Choice Hotels Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Choice Hotels branded hotels;

c. The Choice Hotels Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Choice Hotels Defendants. The Choice Hotels Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. The Choice Hotels Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. The Choice Hotels Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. The Choice Hotels Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Choice Hotels Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the Choice Hotels Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. The Choice Hotels Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Choice Hotels properties, including suspected trafficking incidents;

i. The Choice Hotels Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Comfort Suites location;

j. The Choice Hotels Defendants maintained control over all details of the terms under which franchised hotels, including the subject Comfort Suites location, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Choice Hotels Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Comfort Suites location;

k. The Choice Hotels Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Comfort Suites location, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. The Choice Hotels Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Comfort Suites location, including trends that would reveal patterns consistent with human trafficking.

81. Choice Hotels directly participated in and retained day-to-day control over renting rooms at the subject Comfort Suites location by, among other things:

a. The Choice Hotels Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. The Choice Hotels Defendants directly made reservations for rooms at the subject Comfort Suites location and accepted payment for those rooms through a central reservation system that they controlled and operated. The Choice Hotels Defendant could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. The Choice Hotels Defendants established and maintained control over a brand-wide "do not rent" system. The Choice Hotels Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Comfort Suites location through detailed policies that it established regarding use of this "do not rent" system;

d. The Choice Hotels Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. The Choice Hotels Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The Choice Hotels Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The Choice Hotels Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Comfort Suites location;

h. The Choice Hotels Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Comfort Suites location until they entered their guest room. This included operational directives regarding payment methods,

31

identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

    i.    The Choice Hotels Defendants required franchisees to use Choice Hotels' property management system, which was owned, maintained, controlled, and operated by the Choice Hotels Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

82. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Comfort Suites location named herein, Choice Hotels continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.T.K.).

83. Choice Hotels knew or should have known that Jane Doe (C.T.K.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (C.T.K.)'s sexual exploitation.

84. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Comfort Suites location, the Choice Hotels Defendants continued participating in a venture at these hotels, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

    a.    The Choice Hotels Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

    b.    The Choice Hotels Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

    c.    The Choice Hotels Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Choice Hotels properties;

    d.    The Choice Hotels Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e. The Choice Hotels Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Comfort Suites location;

f. The Choice Hotels Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Comfort Suites, the Choice Hotels Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h. The Choice Hotels Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The Choice Hotels Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Choice Hotels Defendants provided traffickers with access to internet services in a manner that the Choice Hotels Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

85. If Choice Hotels had exercised reasonable diligence when operating their Comfort Suites and in the areas where it retained control, Choice Hotels would have prevented the subject Comfort Suites location from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.T.K.). Instead, Choice Hotels engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.T.K.).

c. **Defendants' ventures at the Comfort Suites.**

86. Through the conduct described above, Choice Hotels and Franchisee Defendant knowingly benefited from engaging in a venture with sex traffickers at the subject Comfort Suites location named herein, including Jane Doe (C.T.K.)'s traffickers, as follows:

33

a. Choice Hotels and Franchisee Defendant both received benefits, including increased revenue, every time a room was rented at the Comfort Suites;

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Comfort Suites location, which Choice Hotels and Franchisee Defendant knew or should have known about;

c. Choice Hotels and Franchisee Defendant associated with traffickers, including Jane Doe (C.T.K.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d. Choice Hotels and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Comfort Suites, fueled by sexual exploitation of victims, including Jane Doe (C.T.K.);

e. Sex traffickers, including Jane Doe (C.T.K.)'s traffickers, frequently used the Comfort Suites location for their trafficking because of an implicit understanding that the Comfort Suites location was an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Choice Hotels and Franchisee Defendant facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for Choice Hotels and Franchisee Defendant;

f. Both Choice Hotels and Franchisee Defendant participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g. Jane Doe (C.T.K.)'s trafficking at the subject Comfort Suites was a result of Choice Hotels and Franchisee Defendant's participation in a venture with criminal traffickers. If Choice Hotels and Franchisee Defendant had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (C.T.K.)'s trafficking at the subject Comfort Suites location.

87. Through the conduct described above, Choice Hotels also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Comfort Suites as follows:

a. Choice Hotels associated with Franchisee Defendant to operate the Comfort Suites location;

b. Pursuant to the terms of the franchising agreement, both Choice Hotels and Franchisee Defendant received financial benefits from operating the Comfort Suites, including revenue generated specifically by renting rooms to traffickers.

They engaged in revenue sharing and had a common incentive to maximize revenue;

c. By participating in a venture that facilitated sex trafficking, each Choice Hotels and Franchisee also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the subject Comfort Suites specifically;

d. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the widespread sex trafficking at the subject Comfort Suites location named herein;

e. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Choice Hotels participated in the venture by continuing to associate with Franchisee Defendant to operate the Comfort Suites location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (C.T.K.); and

f. Jane Doe (C.T.K.)'s trafficking at the Comfort Suites location named herein was a result of Choice Hotels' and Franchisee Defendant's facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Comfort Suites location. Had Choice Hotels not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (C.T.K.)'s trafficking at the subject Comfort Suites location named herein.

## VI. Franchisee Defendant and the Staff at the Comfort Suites Location Named Herein Acted as Actual Agents of Choice Hotels.

88. Choice Hotels is vicariously liable for the acts, omissions, and knowledge of Choice Hotels and staff at the subject Comfort Suites, which is Choice Hotels' actual agents or subagents.

89. The Choice Hotels Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Comfort Suites location through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Choice Hotels Defendants.

35

90.     The Choice Hotels Defendants obscure the full extent of control they exercise over the franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Choice Hotels Defendants imposed on the franchisee:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Comfort Suites;

    b. covered virtually all aspects of hotel operations, including internal operating functions;

    c. dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the subject Comfort Suites; and

    d. significantly exceeded what was necessary for Choice Hotels to protect its registered trademarks.

91.     In addition to the ways described above, upon information and belief, Choice Hotels exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Comfort Suites, including the following ways:

    a. The Choice Hotels Defendant required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Choice Hotels Defendants to protect their registered trademarks;

    b. The Choice Hotels Defendants provided training for hotel management and select hotel staff on-site at the subject Comfort Suites and at locations selected by the Choice Hotels Defendants;

    c. The Choice Hotels Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

    d. The Choice Hotels Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e. The Choice Hotels Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  For certain products and services that franchisees were required to purchase to operate the subject Comfort Suites, the Choice Hotels Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g.  The Choice Hotels Defendants required franchisee to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the Comfort Suites. Franchisee was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h.  The Choice Hotels Defendants set required staffing levels for the Comfort Suites;

i.  The Choice Hotels Defendants established detailed job descriptions for all positions in its properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Choice Hotels Defendants set requirements for the hiring process used by franchisee and oversaw employee discipline processes and termination decisions;

k.  The Choice Hotels Defendants provided benefits for employees of franchised hotels;

l.  The Choice Hotels Defendants required Defendant Franchisee to use a customer resource management program maintained and operated by the Choice Hotels Defendants;

m.  The Choice Hotels Defendants controlled channels for guests to report complaints or provide feedback regarding the Comfort Suites, and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Choice Hotels Defendants retained the right to provide refunds or other compensation to guests and to require Defendant Franchisee to pay associated costs;

n.  The Choice Hotels Defendants generated reports and analysis of guest complaints and online reviews for the Comfort Suites;

o.  The Choice Hotels Defendants required Defendant Franchisee to use a Guest Relations Application owned, operated, and maintained by the Choice Hotels Defendants to manage all guest data and information. The Choice Hotels Defendants could use the backend of this system to analyze data and generate reports;

37

p. The Choice Hotels Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if the Choice Hotels Defendants determined that the franchisees have not purchased adequate insurance;

q. The Choice Hotels Defendants regularly audited the books and records of Defendant Franchisee;

r. The Choice Hotels Defendants conducted frequent and unscheduled inspections of Choice Hotels properties, including the Comfort Suites;

s. The Choice Hotels Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the Choice Hotels Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Comfort Suites;

t. The Choice Hotels Defendants controlled all marketing for the Comfort Suites and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Choice Hotels Defendants;

u. The Choice Hotels Defendants imposed detailed recordkeeping and reporting requirements on Defendant Franchisee regarding virtually all aspects of hotel operations;

v. The Choice Hotels Defendants supervised and controlled day-to-day operations of the Comfort Suites through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendant Franchisee to use; and

w. The Choice Hotels Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## VII. Defendants are Jointly and Severally Liable for Jane Doe (C.T.K.)'s Damages.

92. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (C.T.K.).

93. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (C.T.K.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

38

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

94. Jane Doe (C.T.K.) incorporates all previous allegations.

**I.    Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a).**

95. Jane Doe (C.T.K.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

96. Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because Franchisee Defendant:

   a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (C.T.K.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

   b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

97. Violations of 18 U.S.C §1595(a) by Franchisee Defendant as a "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.T.K.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.    Count 2: Beneficiary Liability under §1595 (a) of the TVPRA.**

98. Jane Doe (C.T.K.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

39

99.    Through acts and omissions described throughout this Complaint, Franchisor Defendants and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (C.T.K.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (C.T.K.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

100.    Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

101.    Violations of 18 U.S.C §1595(a) by Franchisor Defendants and Franchisee Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.T.K.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

III.    **Count 3: Vicarious Liability for TVPRA Violations.**

102.    Franchisee Defendant acted as the actual agent of Choice Hotels  when operating its respective hotel property.

103.    Through the acts and omissions described throughout this Complaint, Choice Hotels exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective hotel property.

104. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

105. Choice Hotels is vicariously liable for the TVPRA violations of its franchisees and the subagents of that franchisee.

106. As alleged above, Franchisee Defendant is directly liable to Jane Doe (C.T.K.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Choice Hotels is vicariously liable to Jane Doe (C.T.K.) for those same violations.

## DISCOVERY RULE

107. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.T.K.) invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

108. Further, Jane Doe (C.T.K) throughout the trafficking period remained under continuous control of her trafficker resulting in her disability.

## DAMAGES

109. Choice Hotels and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (C.T.K.) to sustain legal damages.

110. Choice Hotels and Franchisee Defendant are joint and severally liable for all past and future damages sustained by Jane Doe (C.T.K.).

111. Jane Doe (C.T.K.) is entitled to be compensated for personal injuries and economic damages, including:

    a. Actual damages (until trial and in the future);

    b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Exemplary/Punitive damages;

j. Attorneys' fees;

k. Costs of this action; and

l. Pre-judgment and all other interest recoverable.

## JURY TRIAL

112. Jane Doe (C.T.K.) demands a jury trial on all issues.

## RELIEF SOUGHT

113. WHEREFORE, Jane Doe (C.T.K.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (C.T.K.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (C.T.K.) may, in law or in equity, show herself to be justly entitled.

*{Signature on following page}*

Respectfully Submitted,

PROVOST UMPHREY LAW FIRM
*/s/ Bryan O. Blevins, Jr.*
Bryan O. Blevins, Jr. | Bar No. 02487300
350 Pine Street, Suite 1100
Beaumont, Texas 77701
409.835.6000
bblevins@pulf.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing is being provided to all opposing counsel via the Court's electronic notification service system on this <u>11th</u> day of <u>February</u> <u>2026</u>.

*/s/ Bryan O. Blevins, Jr.*
Bryan O. Blevins, Jr.

43