UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**JANE DOE (C.T.K.),**

**Plaintiff,**

**v.** **Case No. 25-C-1274**

**CHOICE HOTELS INTERNATIONAL, INC., et al.,**

**Defendants.**

---

## DECISION AND ORDER GRANTING MOTIONS TO DISMISS

---

This case raises the question of when a hotel can be held civilly liable to an alleged victim of sex trafficking that occurred in rooms it was renting to adult guests. Plaintiff C.T.K. brought this suit against Defendants under the Trafficking Victims Protection Reauthorization Act (TVPRA). Plaintiff alleges she was trafficked at a Comfort Suites hotel in Appleton, Wisconsin and seeks to hold the operator of that hotel, App Pro, as well as App Pro's franchisor, Choice Hotels International, Inc. and Choice Hotels International Service Corp. (together, Choice Hotels), liable for damages. Plaintiff's theory, as authorized by the civil remedy provisions of the TVPRA, is that Defendants "knowingly benefit[ed] . . . from participation in a venture which [they] knew or should have known has engaged in an act" of criminal sex trafficking. 18 U.S.C. § 1595(a).

Since filing suit, Plaintiff has amended her complaint twice. The Court dismissed Plaintiff's First Amended Complaint (FAC) against all Defendants on January 12, 2026. After Plaintiff filed a Second Amended Complaint (SAC), Defendants again moved to dismiss the SAC for failure to state a plausible claim for relief. Dkt. Nos. 81–82. For the reasons set forth below, the Court grants Defendants' motions to dismiss.

## BACKGROUND

The facts underlying this case and detailed in both the FAC and SAC were set forth in the Court's previous decision granting Defendants' motions to dismiss. Dkt. No. 77. In short, Plaintiff alleges she was a victim of sex trafficking which took place at a Comfort Suites hotel in Appleton, Wisconsin, a hotel which is operated by App Pro under a franchise granted by the Choice Hotels defendants. SAC ¶¶ 14–15, 27–28, Dkt. No. 78. Due to the prevalence of sex trafficking in the hotel industry at large, awareness of sex trafficking at Choice-affiliated hotels around the country, the presence of known "red flags" of sex trafficking at the Comfort Suites, and Plaintiff's behavior and appearance, which itself exhibited "red flags" of sex trafficking, Plaintiff alleges that Defendants had knowledge of and facilitated the sex trafficking venture she was subject to. *Id.* ¶¶ 66–67, 71, 74.

The Court focuses here on the new allegations included in the SAC. First, Plaintiff adds allegations regarding the relationship between her and her traffickers. She alleges that one of her traffickers pretended to be her boyfriend and used false promises to persuade her to engage in commercial sex. *Id.* ¶ 21. She further claims that her traffickers controlled her through monetary dependence, drug dependence, and verbal and physical abuse. *Id.* ¶¶ 23–25.

Plaintiff also adds facts related to the link between commercial sex in hotels and sex trafficking. Ultimately, Plaintiff alleges that "signs of commercial sex [in hotels] are and should be treated as signs of sex trafficking." *Id.* ¶ 41. She claims that "ordinary prudence . . . required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims." *Id.* ¶ 43.

Finally, Plaintiff includes allegations that specifically address trafficking at the Comfort Suites. She alleges that the Comfort Suites had a reputation as a favorable venue for trafficking because hotel staff would not interfere with illegal activity. *Id.* ¶¶ 63–64. She also claims, in greater detail than the FAC, that employees of the Comfort Suites observed her exhibiting several "red flags" of sex trafficking, including:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (C.T.K.);

c. Jane Doe (C.T.K.) and her traffickers stayed multiple times between July 1, 2014 through March 31, 2015;

d. Jane Doe (C.T.K.) or another victim was often forced to go to the front desk to rent the room;

e. Her trafficker was often present with Jane Doe (C.T.K.) at check-in, monitoring her;

f. Jane Doe (C.T.K.) asked for clean sheets and towels multiple times a day;

g. Jane Doe (C.T.K.)'s trafficker would remain on site at the subject Comfort Suites, such as remaining in the pool area, even though he was not a registered guest at the hotel;

h. Jane Doe (C.T.K.) would often be dressed in provocative clothing while checking in or in common areas of the hotel;

i. Jane Doe (C.T.K.) was noticeably impaired by drugs while at the subject Comfort Suites;

j. Jane Doe (C.T.K.) was significantly underweight, anxious, and often in a daze while being trafficked;

k. There was heavy foot traffic in and out of Jane Doe (C.T.K.)'s room involving men who were not hotel guests;

l. Jane Doe (C.T.K.) had multiple johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time;

m. Jane Doe (C.T.K.)'s traffickers would be visible coming and going from the hotel room to collect the money earned from commercial sex;

n. The traffic to and from Jane Doe (C.T.K.)'s room would pass by the front desk and would be visible to other staff, such as housekeeping, performing ordinary duties at the hotel;

o. When housekeeping entered the room after they left, there would be visible sex paraphernalia and evidence of drug use;

p. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

*Id.* ¶ 67. As a result, Plaintiff alleges Defendants had constructive knowledge of the sex trafficking activity occurring at the Comfort Suites and facilitated such trafficking by continuing to rent rooms to traffickers and failing to intervene. *Id.* ¶¶ 75, 79, 82.

Plaintiff brings three claims in the SAC: (1) a perpetrator liability claim against defendant App Pro; (2) a beneficiary liability claim against defendants App Pro and Choice Hotels; and (3) a vicarious liability claim against Choice Hotels.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Instead, a plaintiff must provide "enough details about the subject-matter of the case to present a story that holds together." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). In evaluating whether the plaintiff has stated a claim, a court must accept as true all of the plaintiff's well-pleaded facts and must draw reasonable inferences in the plaintiff's favor.

Further, the complaint must contain factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The plaintiff's allegations must plausibly suggest—not merely be consistent with—an entitlement to relief. *Id.* at 557. "If the allegations give rise to an obvious alternative explanation, then the complaint may stop [] short of the line between possibility and plausibility of entitlement to relief." *McCauley*, 671 F.3d at 616 (internal quotation marks and citations omitted).

## ANALYSIS

### A. TVPRA Liability

The TVPRA, 18 U.S.C. § 1595, sets forth civil remedies for sex trafficking victims:

> (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

Importantly, the TVPRA's civil remedies turn on the definition of criminal sex trafficking. As relevant here, criminal sex trafficking of an adult requires that "means of force, threats of force, fraud, [or] coercion" cause a person to engage in a commercial sex act. § 1591(a). Sex trafficking of a minor, on the other hand, does not require proof of coercion, fraud, force, or the like. *Id.* This distinction is critical. Civil liability in an adult sex trafficking case requires constructive or actual knowledge that a person was subject to sex trafficking *as a result of* fraud, force, or coercion, whereas civil liability for sex trafficking a minor only requires constructive knowledge that the victim engaged in commercial sex. Where the plaintiff is an adult, as is the case here, this distinction can prove fatal to their claims.

As written, the TVPRA establishes two types of civil liability: (1) perpetrator liability, for those who committed a criminal sex trafficking offense; and (2) participant or beneficiary liability. Perpetrator liability under section 1595(a) refers to the liability of a person who actually commits a crime in violation of section 1591(a). Participant/beneficiary liability refers to one who "knowingly benefits, . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." § 1595(a). Plaintiff alleges that App Pro is liable to her both as a perpetrator and as a

participant. Because the standard for participant/beneficiary liability is lower, the Court will address that first.

### B. App Pro

#### 1. Beneficiary Liability

The Seventh Circuit has held that a plaintiff suing under a theory of participant or beneficiary liability must allege "(1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023). The Court begins its analysis with whether the SAC alleges the existence of the required venture.

##### a. Venture Which Has Engaged in an Act in Violation of Section 1591

The first element is the existence of "a venture which . . . has engaged in an act in violation" of section 1591. 18 U.S.C. § 1595(a). Plaintiff has alleged facts that, if true, are sufficient to establish that such a venture existed. The SAC alleges that the unidentified person or persons who caused Plaintiff to engage in commercial sex acts violated section 1591. The SAC alleges that one of her traffickers "initially pretended to be her boyfriend," "preyed on her obvious vulnerabilities," and "used false promises that he wanted a romantic relationship" and would take care of her "to groom her and make her dependent on him." ¶ 21. The SAC goes on to allege that her traffickers "used drug dependence to coerce Jane Doe (C.T.K.)." *Id.* ¶ 24. It alleges they provided her with heroin to fuel a drug dependence, then threatened to cut off her access to drugs and financial support if she did not comply, and at times, did withhold her access to ensure that she complied with their demands. Finally, the SAC alleges that Plaintiff's traffickers "used both verbal and physical abuse to ensure her compliance with their demands and in response to any sign of

resistance. They degraded and demeaned her, threatened her, and beat her when she failed to comply with their demands." *Id.* ¶ 25.

The SAC asserts the existence of a venture between Plaintiff's traffickers and App Pro. *Id.* ¶ 86. That venture involved renting rooms where the trafficking occurred and permitting the traffickers to operate on the hotel property. *Id.* Although the purpose of the room rentals, in App Pro's eyes, may not have been for sex trafficking, that intent is immaterial because a venture can include "a business whose primary focus is not on sex trafficking." *G.G.*, 76 F.4th at 554. These allegations, if true, are sufficient to show the existence of a venture which has engaged in an act in violation of section 1591.

**b. Actual or Constructive Knowledge that the Venture Violated Section 1591**

The second element is that the defendant "knew or should have known that the venture had violated Section 1591." *G.G.*, 76 F.4th at 553. As to this element, it is important to note how this case differs from *G.G.* In *G.G.*, the plaintiff, a minor at the time she was trafficked, claimed that Salesforce, a company that provided customized computer software to help other companies more efficiently serve their customers, knowingly participated and benefitted from its participation in the sex trafficking venture that resulted in her victimization. *Id.* at 548. The sex trafficking venture in which Salesforce was alleged to have participated was the online marketplace operated by Backpage.com, which had allowed G.G.'s sex trafficker to advertise her for commercial sex. *Id.* at 549. Salesforce had entered a series of lucrative contracts with Backpage which were designed to "facilitate and support" Backpage's "exponential growth" and to give Backpage "the ability to keep pace with increasing customer demand and scale its platform into an international sex-trafficking hub." *Id.* Even before Salesforce entered into its contractual relationship with Backpage, the complaint alleged, Backpage "had been publicly identified by law enforcement,

United States Attorneys General, and every state Governor as the biggest and most notorious sex trafficking and pimping website in the United States." *Id.* According to the complaint, Salesforce's efforts to help Backpage achieve its objectives were quite successful:

> [Salesforce] enabled Backpage "to scale its operations and increase the trafficking conducted" through its site. With Salesforce's help, Backpage grew "to become the dominant force in online sex trafficking." Backpage experienced "unprecedented growth" in both its business and profits and was transformed from a "small . . . company with a handful of employees to an international powerhouse with over 250 employees spanning three continents." From the beginning of 2008 through the end of 2010, Backpage's gross revenues totaled $46 million. In 2012 alone, Backpage's gross revenue was $71 million. And from January 2013 through May 2015, Backpage's gross revenue climbed to approximately $346 million, nearly $340 million of which was generated from adult advertising. As Backpage's business expanded and its profits grew, "the scope of work covered by the Salesforce contracts," as well as Salesforce's profits from those contracts, also grew. Salesforce stopped doing business with Backpage only when it was shut down by the federal government in April 2018.

*Id.* at 550. In sum, the complaint in *G.G.* alleged that Salesforce directly assisted a known sex trafficker continue and expand its business of advertising sex-trafficked victims, including minors like G.G., for its own financial benefit. Even apart from the public knowledge that identified Backpage as "the leading platform for the facilitation of sex trafficking and other forms of human degradation," the court held that "plaintiffs are entitled to a reasonable inference at this stage of the case that, based on Salesforce's relationship with Backpage, Salesforce either 'knew or should have known' that at least a substantial part of Backpage's business was illegal sex trafficking, including trafficking of children." *Id.* at 555.

This case, by contrast, involves a hotel that rents rooms on a daily basis to out-of-town travelers and others looking for a short-term place to stay. The Appleton Comfort Suites treated Plaintiff like it treated all its customers: it provided a clean room in which she could temporarily stay. Although the SAC alleges that Plaintiff's trafficking "repeatedly occurred" in the rooms she rented at the hotel over the nine-month period during which she was trafficked, it does not state

how many times or how often she stayed at the hotel, whether it was continuous for days at a time or sporadic.

It is also important to note that because Plaintiff is an adult, it is not enough that there were red flags that she was engaged in prostitution. For her to be considered a sex-trafficking victim as an adult, there must be reason to believe she was caused to engage in commercial sex by "means of force, threats of force, fraud, coercion . . . , or any combination of such means." § 1591(a)(2). This is crucial because the SAC does not allege that Plaintiff ever told anyone at the Appleton Comfort Suites hotel that she was being forced to engage in commercial sex acts by others. Nor does it allege that any employee of the hotel saw her being threatened, her being physically abused or beaten, or that she had any visible bruises or injuries while she was staying there.

It also appears from the allegations of the SAC that Plaintiff had plenty of opportunities to tell hotel employees or the police, for that matter, that she was being forced to engage in commercial sex acts. It is clear from the SAC that Plaintiff was often outside the presence of her alleged trafficker or traffickers. The SAC suggests that Plaintiff, not her traffickers, went to the front desk to rent the room in which she was staying. Although the SAC alleges "[h]er trafficker was often present . . . at check-in, monitoring her," SAC ¶ 67(e), it is unclear where he was when she checked in and paid. There were also apparently many occasions when he was not there. The traffickers would come and go from the hotel to collect money earned from commercial sex. *Id.* ¶ 67(m). The SAC alleges Plaintiff also "asked for clean sheets and towels multiple times a day." *Id.* ¶ 67(f). If she was able to call housekeeping to ask for clean sheets and towels, she would clearly have been able to tell housekeeping, the front desk, or even the police that she was being forced to engage in acts of commercial sex.

Absent any evidence or indication by Plaintiff that she was being held against her will, it is difficult to see how hotel staff would have reason to believe she was being *caused* to engage in commercial sex acts or that she was a victim of sex trafficking. Indeed, it appears questionable whether even Plaintiff, at least initially, was aware she was involved in sex trafficking. According to the SAC, one of the traffickers is alleged to have "initially pretended to be [Plaintiff's] boyfriend" but then "preyed on her obvious vulnerabilities and used false promises that he wanted a romantic relationship and that he would take care of Jane Doe (C.T.K.) to groom her and make her dependent on him." SAC ¶ 21. Is a woman who accedes to the request of her boyfriend to engage in commercial sexual activities being *caused* to do so, as section 1591(a) requires? To so rule would seem to suggest that adult women are incapable of making their own decisions. This is not a case where the victim responded to a phony advertisement promising to help her build a modeling career or make her a Hollywood star or the newest music sensation, only to be kidnapped and forced into prostitution. Of course, the SAC also alleges that Plaintiff's traffickers later used drug dependence, threats of physical abuse, and actual abuse to force her to comply with their demands, but, again, there are no allegations that any of these forms of coercion were visible to hotel staff or management.

It is the absence of any allegation that Plaintiff ever asked for help, that hotel staff or management saw or heard any signs of abuse or threats of abuse, or that hotel staff were collaborating with the traffickers that distinguishes this case from those that have gone forward beyond the pleading stage. For example, in *M.A. v. Wyndham Hotels & Resorts, Inc.*, the court denied the defendants' motions to dismiss, finding that the plaintiff adequately pled constructive knowledge. 425 F. Supp. 3d 959 (S.D. Ohio 2019). There, the plaintiff alleged that hotel staff actually saw her abuse occurring: "Despite her desperate pleas and screams for help, after being

beaten or choked at the Defendants' hotel properties, the hotel staff ignored her and did nothing to prevent the ongoing and obvious torture she endured while she was regularly trafficked for sex at Defendants' hotel properties." *Id.* at 967. Several other courts have reached similar conclusions. *See Emily T. v. SBY Downers Grove*, No. 25 C 3303, 2026 WL 1265381 (N.D. Ill. May 8, 2026) (concluding that allegations that the victims exhibited bruising and other injuries and that many defendants observed screaming, fighting, and beatings by the trafficker were enough to survive several motions to dismiss); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 193 (E.D. Pa. 2020) (finding constructive knowledge where hotel staff "observed [the victim] with signs of visible injury on more than one occasion, frequent loud altercations, and attacks on [the victim] by her trafficker were constant and loud enough for hotel patrons and staff to hear"); *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) (holding that constructive knowledge was satisfied when staff discovered the victim "tied to the guest room bed" and ignored her pleas for help).

In other cases that have advanced past the pleadings, the plaintiff alleged a relationship between the hotel employees and the traffickers. In *Ricchio v. McLean*, for instance, the hotel operator and the trafficker exchanged high-fives in the motel parking lot, expressing their enthusiasm for reinstating the sex trafficking scheme that had existed at the motel in the past. 853 F.3d 553, 555 (1st Cir. 2017). The hotel owner also "ignored [the victim's] plea for help in escaping [her trafficker's] custody" and saw the trafficker "grab [the victim], kick her, and force her back toward the rented quarters when she had tried to escape." *Id.* Again, courts have frequently reached the same conclusion when presented with similar facts. *See A.D. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-648-JES-NPM, 2023 WL 5510267 (M.D. Fla. Aug. 25, 2023) (finding a hotel franchisee had constructive knowledge of sex trafficking due to "the personal

relationship with staff and A.D.'s trafficker" and "the direct employee encounters with A.D. and her trafficker inside the Comfort Suites"); *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228 (N.D. Ga. 2022) (holding that constructive knowledge existed when a hotel's employees "acted as lookouts for Plaintiff's sex traffickers, alerting them to police activity at the hotel as well as warning about guest complaints and high visitor traffic drawing unwanted attention").

The SAC lacks these sorts of allegations. As to Plaintiff personally, the SAC alleges that she was often "dressed in provocative clothing while checking in or in common areas of the hotel," that she "was noticeably impaired by drugs while at the subject Comfort Suites," and that she was "significantly underweight, anxious, and often in a daze while being trafficked." SAC ¶ 67(h)–(j). These vague and conclusory allegations fall short of the allegations that hotel staff actually observed threats or violence directed toward, or injuries to the victim of sex trafficking, or collaborated with the traffickers.

While the SAC alleges there were red flags that Plaintiff was engaged in commercial sexual activities, not all individuals who engage in commercial sex are sex trafficking victims. The TVPRA is not intended to compensate individuals who willingly engage in commercial sex; nor is it intended to conscript hotels to police the morals of their guests. The SAC alleges, for example, that App Pro "facilitated widespread trafficking at their Comfort Suites location" by, inter alia, "allowing a high volume of sex buyers, who were not registered hotel guests, to freely access the hotel without requiring identification or taking any other steps to log or track these unregistered visitors," and "allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking." *Id.* ¶¶ 79(c)–(d). To be sure, hotels could hire additional staff, invest in additional technology, and conduct continuous surveillance to make it more difficult for commercial sex to take place in the

rooms they rent. But doing so would increase the cost of renting a room. If it was Congress' intent to impose such an obligation on hotel owners and operators, it owed it to them to make that intent clear.

The Court therefore declines to accept Plaintiff's argument that signs of commercial sex in hotels should be treated as signs of sex trafficking. SAC ¶¶ 42–43. This argument ignores the definition of criminal sex trafficking and its differing treatment of minors and adults. As noted above, criminal sex trafficking of an adult requires that "means of force, threats of force, fraud, [or] coercion" be used to cause a person to engage in a commercial sex act. § 1591(a). Sex trafficking of a minor, on the other hand, does not require proof of coercion, fraud, force, or the like. *Id.* It only requires proof that the minor was caused to engage in commercial sex. *Id.* Because the criminal statute does not treat commercial sex as sex trafficking when there is an adult victim, the civil remedy should not either.

District courts have regularly dismissed cases where the plaintiff's allegations only support an inference of commercial sex rather than sex trafficking. *See, e.g.*, *Keller v. Danford*, No. 2:25-CV-595-TS-JCB, 2026 WL 892290, at *5 (D. Utah Mar. 31, 2026) ("Relevant here, district courts have routinely dismissed cases where the facts alleged support only that defendants were or should have been aware of commercial sex work generally, as opposed sex work induced by force, threats, fraud, or coercion, as prohibited by the TVPRA."); *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464, 470–73 (E.D.N.C. 2024) (collecting cases); *Lydia K. v. G6 Hosp. Franchising LLC*, No. 3:25-CV-0755-N, 2026 WL 370057, at *4 (N.D. Tex. Feb. 10, 2026) ("While these alleged facts may be sufficient to say that an observer knew or should have known of commercial sex, they do not suggest that G6, Omni or PKA should have known that Lydia was trafficked as a result of force, fraud, or coercion, the specific activity prohibited by the TVPRA."). This Court agrees

and concludes that the allegations in the SAC do not plausibly allege that App Pro had constructive knowledge of Plaintiff's trafficking.

**c. Participation in the Venture**

The third element of a beneficiary liability claim is "participation in a venture." Participation, in this context, does not require direct participation in the sex trafficking. *G.G.*, 76 F.4th at 559. Rather, participation is defined as "culpable assistance to a wrongdoer," which requires "a desire to promote the wrongful venture's success." *Id.* (quoting *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)). Further, "[w]here the participant provides assistance, support, or facilitation to the trafficker through . . . a 'continuous business relationship,' a court or jury may infer that the participant and trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595." *Id.*

In *G.G.*, this type of "continuous business relationship" existed because Salesforce entered into several lucrative contracts with Backpage, a website known as one of the biggest sex trafficking websites in the United States. *Id.* at 560. Pursuant to those contracts, Salesforce provided "targeted solutions," "tailored" assistance, and "active, ongoing" support to Backpage. *Id.* Even though Salesforce did not "get[] [their] hands dirty" by participating in any criminal sex trafficking act, it was enough for "plaintiffs [to] allege that Salesforce facilitated the success of Backpage's sex-trafficking venture *as a whole*." *Id.* at 561 (emphasis in original). This conclusion was further supported by the fact that "Salesforce was not one step removed from [the plaintiff's] traffickers." *Id.* Rather, "[i]t was in a direct, prolonged, and supportive contractual relationship with one of those sex traffickers—Backpage." *Id.*

In this case, by contrast, there is no allegation that the Appleton Comfort Suites had "a direct, prolonged, and supportive contractual relationship with one of those sex traffickers." *Id.*

There is not even an allegation that Plaintiff's trafficker or traffickers ever rented the rooms where the commercial sex acts occurred. As noted above, the SAC alleges that although her trafficker was often present, "Jane Doe (C.T.K.) or another victim was often forced to go to the front desk to rent the room." SAC ¶ 67(d). There is no allegation of a "continuous business relationship" with Plaintiff's trafficker(s). As noted above, while Plaintiff alleges she was trafficked over a nine-month period, she does not specify how often she stayed at the Appleton Comfort Suites. In short, there is no allegation that would support even the inference that the Appleton Comfort Suites provided "culpable assistance to a wrongdoer," and that it had "a desire to promote the wrongful venture's success." *G.G.*, 76 F.4th at 559. It thus follows that the participation element is also missing. For all of these reasons, the SAC fails to state a claim for participant/beneficiary liability under the TVPRA.

**2. Perpetrator Liability**

Plaintiff's perpetrator liability claim against App Pro fails for the same reasons. A perpetrator claim under the TVPRA imports the mens rea requirement from the criminal statute, section 1591, which requires actual knowledge of sex trafficking by means of "force, threats of force, fraud, [or] coercion." Because Plaintiff fails to adequately allege constructive knowledge on the part of App Pro, she also has not pled facts sufficient to meet the more demanding knowledge requirement for perpetrator liability. *See, e.g.*, *Lydia K.*, 2026 WL 370057, at *5. In sum, the SAC fails to state a claim against App Pro for either beneficiary or perpetrator liability.

**C. Choice Hotels**

The claims against the Choice Hotels defendants fall short as well. Plaintiff has failed to state a claim against App Pro for beneficiary liability, and therefore the vicarious liability claim

against Choice Hotels necessarily fails. *See, e.g.*, *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 431 (N.D. Tex. 2021).

Further, Plaintiff has not alleged facts sufficient to make a plausible beneficiary liability claim against Choice Hotels. Choice Hotels is even further removed from the alleged trafficking venture than App Pro, making Plaintiff's task of pleading constructive knowledge and participation all the more difficult. Indeed, because a franchisor typically cannot observe alleged signs of sex trafficking, a beneficiary claim against a franchisor requires the plaintiff to allege that the franchisor received notice that the trafficking venture was occurring at its property. *See A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 939 (D. Or. 2020). In other words, Plaintiff must "connect the dots" between the alleged trafficking and the franchisor. *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 734 (E.D. Tex. 2024).

Plaintiff attempts to satisfy this requirement in several ways. First, Plaintiff claims that she exhibited several "red flags" of sex trafficking which were observable to hotel operators and that reasonable diligence required treating these "red flags" as indicators of sex trafficking. Pl.'s Br. at 7, Dkt. No. 87. But absent any evidence that Choice Hotels was made aware of these red flags, these allegations only support whether App Pro had constructive knowledge, not the Choice Hotels defendants. Beyond these observation-related allegations, Plaintiff argues Choice Hotels had constructive knowledge due to their "operational control and supervision" over the Comfort Suites. *Id.* at 10–11. Because Choice Hotels required the hotel operators to report suspected criminal activity, as well as implemented other channels of supervision, Choice Hotels both "participated in" and "should have known" of the alleged sex trafficking occurring at the hotel. *Id.* However, if even App Pro, the operator of the hotel, had no reason to know that Plaintiff was being sex

trafficked, Choice Hotels' oversight of App Pro would not lead to constructive knowledge of such activity either.

In sum, Plaintiff makes no allegation sufficient to "connect the dots" between the sex trafficking venture and Choice Hotels. Therefore, both the vicarious liability and beneficiary liability claims against the Choice Hotels defendants fail.

**CONCLUSION**

Accordingly, for the reasons stated herein, the motions to dismiss the SAC by Choice Hotels (Dkt. No. 82) and App Pro (Dkt. No. 81) are **GRANTED**. Plaintiff has already amended her complaint twice and has not requested leave to amend her complaint a third time. Therefore, the case is dismissed with prejudice, and the clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of October, 2026.

William C. Griesbach
United States District Judge